U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



Signed March 10, 2010

United States Bankruptcy Judge

---

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| GARY R. COOPER and | § | Case No. 99-32282-SGJ-7 |
| JUNANNE M. COOPER, | § | |
| | § | |
| Debtors. | § | |
| DIANE G. REED, CHAPTER 7 | § | |
| TRUSTEE, and | § | |
| THE CADLE COMPANY, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adversary No. 06-3127 |
| | § | |
| GARY R. COOPER, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION IN SUPPORT OF JUDGMENT REVOKING DISCHARGE UNDER SECTION 727(D)(2) AND REQUIRING TURNOVER OF CERTAIN FUNDS**

-1-

Before this court is the Plaintiffs' First Amended Complaint (the "Amended Complaint") brought by Co-Plaintiffs Diane G. Reed, the Chapter 7 Trustee ("Reed" or the "Trustee"), and The Cadle Company ("Cadle," and collectively with the Trustee, the "Co-Plaintiffs") and the Defendant's Response to Plaintiffs' First Amended Complaint (the "Amended Response"), filed by Gary R. Cooper (the "Defendant," "Mr. Cooper," or the "Debtor"). This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A),(E),(J), and (O). This memorandum opinion constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. Where appropriate, a finding of fact will be construed as a conclusion of law and *vice versa*.

## I. Procedural Posture

Mr. Cooper, together with his wife, Junanne M. Cooper (who is not a party to the Amended Complaint), filed a chapter 7 case on March 25, 1999 (the "Bankruptcy Case"). As will further be explained herein, in this adversary proceeding (the "Adversary Proceeding"), the Co-Plaintiffs both seek revocation of Mr. Cooper's discharge (quite some time after the fact). Additionally, the Trustee, as sole Plaintiff, seeks turnover of certain proceeds of property of the estate, as well as damages as

a result of the Debtor's alleged post-discharge fraud.[1]

The Adversary Proceeding was first initiated on February 13, 2006. On July 14, 2006, the Trustee alone (without Cadle) filed a Motion for Approval of Compromise and Settlement Agreement with Gary R. Cooper (the "Compromise"). The Compromise provided that, in exchange for a full release and dismissal of the Adversary Proceeding (including dismissal of Cadle's claims), Mr. Cooper would pay $46,000 to the Trustee upon entry of an order approving the Compromise and upon dismissal of the Adversary Proceeding with prejudice. In other words, Mr. Cooper would keep his discharge, but would pay to the estate the approximately $46,000 that he allegedly wrongfully withheld (and was subject to the turnover claim). Cadle objected to the Compromise asserting, among other things, that the Trustee should not be permitted to fully settle the Adversary Proceeding over Cadle's objection because Cadle could have brought its section 727(d) request for revocation of Mr. Cooper's discharge independent of the Trustee. This court approved the Compromise as fair and equitable (given all the risks, rewards, and other circumstances) over Cadle's objection. Cadle appealed and the District Court, Judge Barbara Lynn, reversed, holding that while the Trustee could settle her own causes of action, she could not settle Cadle's section 727(d)

---

[1] Cadle at one point sought standing to pursue the turnover and fraud claims by itself, but this court declined to give it standing. *See Reed v. Cooper (In re Cooper)*, 405 B.R. 801 (Bankr. N.D. Tex. 2009).

claims over Cadle's objection.  The matter was remanded to this Court for further proceedings on July 18, 2008.  After various procedural skirmishes, a trial was finally held on December 11, 2009 (the "Trial").

## II. Findings of Fact

### A.   Mr. Cooper's Bankruptcy Case and His Various Interests in Real Property

Mr. Cooper and Junanne M. Cooper (collectively, the "Coopers") received a discharge in the Bankruptcy Case on August 6, 1999.  The Coopers had listed several interests in real property in their bankruptcy schedules (the "Schedules") including: (1) real property located at 211 Oakridge Trail, Kennedale, Tarrant County, Texas (the "Oakridge Property"); (2) 1/3 of an interest in real property located at 470 North Little School Road, Kennedale, Tarrant County, Texas (the "470 Property"); and (3) 1/3 of an interest in real property located at 480 North Little School Road, Kennedale, Tarrant County, Texas (the "480 Property").[2]  Both the 470 Property and the 480 Property were assets in the probate estate of Dorothy Garrett, the deceased mother of Mr. Cooper.

### B.   The Sale of the Oakridge Property (Partially Homestead)

The Oakridge Property consisted of approximately 3.4 acres of land and was claimed by the Coopers as entirely exempt

---

[2] *See* Reed's Exhibit 1.

-4-

homestead property under Texas law.[3] The Trustee advised the Coopers that she objected to this designation.[4] Prior to filing such objection, however, the Trustee and the Coopers ultimately reached an agreement regarding the sale of the Oakridge Property and the disposition of the proceeds. In a letter dated November 22, 1999 from Louis A. Shaff ("Shaff"), the Coopers' prior bankruptcy counsel, the Coopers offered to the Trustee the sum of $50,000 for all non-exempt property listed in the Cooper's Schedules (including the Oakridge Property, the 480 Property and the 470 Property).[5] However, per a letter dated November 22, 1999 from David W. Elmquist ("Elmquist"), the Trustee's counsel, the Trustee rejected this offer, and countered with an offer "to accept the sum of $50,000 for the approximately two acres of non-exempt property surrounding" the Cooper's homestead (the "Non-Exempt Oakridge Property").[6] In a letter dated November 23, 1999 from Shaff, the Debtor accepted the Trustee's counter-offer of the sum of $50,000.00 for the Non-Exempt Oakridge Property.[7]

After this negotiation, on December 15, 1999, the Trustee

---

[3] *See* Reed's Exhibit 2.

[4] At the time in question, Texas law provided that an individual was permitted to claim up to one acre of property in an urban area as exempt and up to 200 acres of property (if married) in a rural area as exempt. *See* Tex. Prop. Code §§ 41.002(a) & (b) (Vernon 1989).

[5] *See* Reed's Exhibit 3.

[6] *See* Reed's Exhibit 4.

[7] *See* Reed's Exhibit 5.

filed a Motion to Sell Property Free and Clear of All Liens (the "Sale Motion"), which sought an order authorizing the sale of the Oakridge Property.[8]  On December 29, 1999 the court entered an Order Granting Motion to Sell Property Free and Clear of All Liens (the "Sale Order").[9]  The Sale Order provided that: (1) the Trustee was authorized to sell pursuant to 11 U.S.C. § 363(f) the Non-Exempt Oakridge Property for the sum of $50,000 free and clear of all liens, claims and encumbrances; and (2) any liens and encumbrances against the Oakridge Property were to attach to, and were to be paid out of, the proceeds of sale attributable to the Exempt Property (as defined in the Sale Motion).[10]  The creditors known by the parties to be holding liens against the Oakridge Property at the time of the Sale Order were: (1) GE Capital Mortgage Services, Inc. (the mortgage lender); (2) the Internal Revenue Service, on account of unpaid income taxes; and (3) an unnamed taxing authority, on account of unpaid property taxes (collectively, the "Known Liens").[11]  The Known Liens were each identified in the Sale Motion (although the Sale Motion was worded in a way to suggest that there might be other liens).

---

[8] *See* Reed's Exhibit 6.

[9] *See* Reed's Exhibit 7.

[10] *See* Reed's Exhibit 7.  The Sale Motion defined "Exempt Property" as "a one acre tract of land upon which the Improvements are located."  *See* Reed's Exhibit 6.

[11] *See* Reed's Exhibit 6 and 8.

-6-

These three Known Liens were all paid in full at the time of the closing of the sale of the Oakridge Property.  At some later time, the Trustee and the Debtors became aware that there were several other creditors asserting liens and encumbrances before the Oakridge Property was sold including at least: (1) First National Bank of Van Alstyne; (2) FDM, Inc.; (3) First Financial Resolution Joint Venture; (4) R.C. Capital Company, LLC; (5) Arbor Mountain Capital; (6) Tarrant County, Texas; and (7) Republic Credit One, L.P[12] (hereinafter, the "Later Discovered Liens").[13]  The evidence presented at the Trial was that the parties did not have actual knowledge of the Later Discovered Liens at the time of the sale of the Oakridge Property.[14]  The Coopers did not appeal or otherwise move to set aside the Sale Order.

**C.**    **The Sale of the 480 Property**

Meanwhile, on September 25, 2000, the Trustee sent a letter (the "September 25, 2000 Letter") to Shaff requesting a status report concerning the probate estate of Dorothy R. Garrett, Mr. Cooper's deceased mother (which included the 480 Property and the

---

[12] Republic Credit One, L.P. ultimately transferred its claim to Cadle pursuant to an Assignment of Judgment dated December 28, 2004.  *See* Defendant's Exhibit QQ-2.

[13] The court also takes judicial notice of the Schedules, which listed the Later Discovered Liens as unsecured nonpriority claims.  This further suggests that the parties were not aware of any secured status (via an abstract of judgment or otherwise) of the Later Discovered Liens.  *See* Reed's Exhibit 1.

[14] *See* Transcript, pg. 33.

470 Property).[15]  Likewise, on September 26, 2000, Elmquist sent
a letter (the "September 26, 2000 Letter") to Shaff requesting
additional information with respect to the real property listed
in the Schedules (including the 480 Property and the 470
Property).[16]  On October 5, 2000, Shaff sent a letter to the
Coopers (which enclosed copies of the September 25, 2000 Letter
and the September 26, 2000 Letter) requesting (among other
things) a status report on the 480 Property and the 470
Property.[17]  More than two months later, on December 5, 2000,
Shaff sent a letter to the Trustee (the "December 5, 2000
Letter").[18]  The December 5, 2000 Letter contained a copy of a
letter received from Mr. Cooper dated November 16, 2000 (the
"November 16, 2000" Letter).  The November 16, 2000 Letter
contained several statements including: (1) that Mr. Cooper was
surprised to have received the September 25, 2000 Letter since it
was his understanding that the settlement of matters pertaining
to the Non-Exempt Oakridge Property (as set forth in the Sale
Order) also resolved issues pertaining to his mother's estate,
since the $50,000 settlement was "significantly over the
appraised value;" (2) that he, along with his brother and sister,

---

[15] *See* Reed's Exhibit 9.

[16] *See* Reed's Exhibit 10.

[17] *See* Defendant's Exhibit BB.

[18] *See* Reed's Exhibit 11.

had an undivided 1/3 interest in the estate of Dorothy R. Garrett; and (3) that there were no plans to liquidate the estate.[19] There was no evidence that the Trustee or Elmquist responded to either the December 5, 2000 Letter or the November 16, 2000 Letter.

However, on June 20, 2002, despite the earlier representation that there were no plans to liquidate his mother's estate, Mr. Cooper along with Roy Joe Cooper and Diann Cooper Walker (collectively, the "Cooper Children") executed and delivered a Warranty Deed conveying the 480 Property for a sale price of $95,000 (with the net proceeds from the sale of the 480 Property being $82,951.16).[20] Mr. Cooper ultimately received $23,350 of the net proceeds from the sale of the 480 Property. The Trustee was not initially aware that Mr. Cooper had received proceeds for his interest in the 480 Property and Mr. Cooper did not take any steps to cause the Trustee to be aware of the sale of the 480 Property. In fact, the Trustee was not aware that there had been a sale of the 480 Property until October 2002, almost three months later.

Upon discovering the sale of the 480 Property, the Trustee sent a letter to Dianne Walker (Mr. Cooper's sister), the executrix of Dorothy Garrett's estate (the "Executrix"), which

---

[19] See id.

[20] See Reed's Exhibits 12, 13 and 14.

-9-

notified the Executrix of the bankruptcy estate's rights with regard to the 480 Property and made a demand for turnover of certain funds (specifically, the funds related to Mr. Cooper's 1/3 interest in the 480 Property).[21]  By a letter dated October 31, 2002, the Executrix stated that the money she received from the sale of the 480 Property had already been turned over to Dorothy Garrett's heirs and that she would not be sending a check to the Trustee.[22]

At some point, the Trustee must have contacted Shaff again, because on January 30, 2003, Shaff sent a letter to the Coopers reiterating the "seriousness of the situation surrounding the sale" of the 480 Property.[23]  Furthermore, Shaff informed Mr. Cooper that his interest in the 480 Property was non-exempt property in the Bankruptcy Case and was property of the bankruptcy estate.[24]  Shaff also stressed the "importance of turning over the proceeds from the sale" to the Trustee.[25]  Finally, Shaff also requested a status report on the 470 Property and reminded the Coopers that the 470 Property was also non-

---

[21] *See* Reed's Exhibit 15.

[22] *See* Reed's Exhibit 16.

[23] *See* Reed's Exhibit 17.

[24] *See id.*

[25] *See id.*

exempt and a part of the bankruptcy estate.[26]

On February 12, 2003, Shaff sent a letter to the Trustee (the "February 12, 2003 Letter") which stated that the Coopers were advised that the 470 Property was property of the bankruptcy estate and, as such, the proceeds from any sale of that property would need to be turned over to the Trustee.[27] Moreover, the February 12, 2003 Letter provided that, with regard to the sale of the 480 Property, the Coopers understood that they needed to turn those proceeds over to the Trustee, and also requested an extension of time to turnover those funds.[28]

**D.    The Sale of the 470 Property**

Almost three years later, and again, without notifying the Trustee, the Cooper Children executed and delivered a Warranty Deed conveying the 470 Property for a sale price of $75,000 on December 28, 2005 (with the net proceeds from the sale of the 470 Property being $68,298.93).[29] Mr. Cooper ultimately received $22,766.31 of the net proceeds from the sale of the 470 Property.

On January 30, 2006, Rattkin Title Company sent a letter to Elmquist regarding the sale of the 470 Property and enclosed a "copy of the HUD-1 Settlement Statement along with copies of the

---

[26] *See id.*

[27] *See* Reed's Exhibit 19.

[28] *See id.*

[29] *See* Reed's Exhibit 22.

check issued for 1/3 of the net proceeds of sale" for the 470 Property.[30]  Upon receiving this letter, Elmquist sent a letter dated February 2, 2006 to Shaff (the "February 2, 2006 Letter") advising him that he was aware of the sale of the 470 Property and would be filing an action against Mr. Cooper to have his bankruptcy discharge revoked pursuant to section 727(d) of the Bankruptcy Code.[31]  Shaff must have informed the Coopers about the February 2, 2006 Letter because Mr. Cooper sent a letter to Shaff on February 7, 2006 (the "February 7, 2006 Letter").[32]  The February 7, 2006 Letter conveyed that it was Mr. Cooper's understanding that the three non-exempt assets of his bankruptcy estate were the Non-Exempt Oakridge Property, the 480 Property, and the 470 Property and that he would be required to pay the Trustee an amount equal to their appraised value.[33]  Furthermore, since he believed that the appraised value of the Non-Exempt Oakridge Property was between $10,000 and $15,000, Mr. Cooper seemed to think that he had over-paid the Trustee because the Trustee received $50,000 in connection with the sale of the Non-Exempt Oakridge Property.  Accordingly, Mr. Cooper asked Shaff to petition the court for an appraisal of the 470 Property and the

---

[30] *See* Reed's Exhibit 23.

[31] *See* Reed's Exhibit 24.

[32] *See* Reed's Exhibit 25.

[33] *See id.*

480 Property (based on their appraised value in 1999, the time
when the Oakridge Property was sold) and asserted that, if the
total value of the three non-exempt assets (the Non-Exempt
Oakridge Property, the 480 Property, and the 470 Property) was
more than $50,000, then he would be willing to pay more funds to
the Trustee.

### E.    The Settlement Agreement

After the Adversary Proceeding was filed, Mr. Cooper and the
Trustee negotiated regarding a potential global settlement of the
issues.  On February 28, 2006, Mr. Cooper sent a proposal to
Elmquist stating that he had been "less than brilliant" and
offered to pay the Trustee $46,116.31 (representing the proceeds
he received from the sale of the 480 Property and the 470
Property).[34]  Mr. Cooper and the Trustee ultimately entered into
a written settlement agreement (the "Settlement Agreement") and
the Trustee filed the Compromise.[35]  As earlier referenced
herein, after an evidentiary prove up, this court entered an
Order Granting Motion for Approval of Compromise and Settlement
Agreement with Gary R. Cooper (the "Settlement Order").[36]
However, as stated above, Cadle objected and ultimately appealed

---

[34] Note that Defendant's Exhibit RR is dated February 28, 2005, however,
parties at the Trial agreed that the correct date of the letter was "February
28, 2006."  *See* Defendant's Exhibit RR.

[35] *See* Defendant's Exhibits SS.

[36] *See* Defendant's Exhibit VV.

entry of the Settlement Order.  After taking this under
advisement, the District Court overturned the Settlement
Agreement and remanded the matter back to this court.

### III. Co-Plaintiffs' Claims and the Defenses of Mr. Cooper

### A.   Co-Plaintiffs' Claims

First, the Co-Plaintiffs allege that Mr. Cooper violated the
Sale Order by failing to utilize the proceeds of the sale of the
Oakridge Property to satisfy the Later Discovered Liens
encumbering the Oakridge Property.  As a result of this conduct,
Mr. Cooper's discharge should be revoked pursuant to 11 U.S.C.
§ 727(d)(3).

Second, the Co-Plaintiffs allege that on two separate
occasions, Mr. Cooper received and did not deliver and account
for property of the bankruptcy estate (*i.e.*, the sale proceeds of
his one-third interest in each of the 480 Property and the 470
Property).  The Co-Plaintiffs allege that Mr. Cooper knowingly
and fraudulently failed to report to the Trustee his receipt of
these proceeds and has knowingly and fraudulently failed to
deliver these proceeds to the Trustee.  As a result of this
conduct, Mr. Cooper's discharge should be revoked pursuant to 11
U.S.C. § 727(d)(2).

Third, because Mr. Cooper has been in possession, custody,
or control of the proceeds from the Sale of the Oakridge Property
(that should have been used to satisfy the Later Discovered

-14-

Liens), the 480 Property, and the 470 Property, the Trustee seeks turnover of $168,423.47[37] pursuant to 11 U.S.C. § 542. Alternatively, the Trustee seeks a judgment against Mr. Cooper in the amount of $168,423.47, plus pre-judgment and post-judgment interest as allowed by law.

Fourth, the Trustee alleges that Mr. Cooper represented that he would distribute the proceeds from the sale of the Oakridge Property to satisfy all the liens encumbering the Oakridge Property.  The Trustee alleges that Mr. Cooper's representations were material, false, and made with the intent that the Trustee would rely on such representations.  The Trustee alleges that she did, in fact, rely on such representations by agreeing to sell the Oakridge Property and by ultimately filing the Sale Motion. Moreover, the Trustee alleges that Mr. Cooper had no intention of performing his representations.  As a result of these representations, the bankruptcy estate has suffered injury (*i.e.*, there now being several secured claims seeking payment from the estate and only $50,000 of proceeds in the estate from the sale of the Oakridge Property) and the Trustee seeks damages for Cooper's common-law fraud in an amount equal to the lesser of (i) the total amount of lien claims that remain outstanding against

---

[37] This amount is derived by adding the proceeds that the Debtor received from the sale of the Oakridge Property ($122,307.16) plus the proceeds that the Debtor received from the sale of the 480 Property ($23,350) plus the proceeds that the Debtor received from the sale of the 470 Property ($22,766.31).

the estate, as a result of Mr. Cooper's refusal to distribute the Oakridge Property proceeds pursuant to the Sale Order; and (ii) $122,307.16.[38]  The Trustee also seeks court costs, pre-judgment and post-judgment interest, exemplary damages, attorney's fees, and other costs and expenses.

Fifth, the Trustee alleges that Mr. Cooper promised to distribute the proceeds from the sale of the Oakridge Property to satisfy all the liens encumbering the Oakridge Property.  The Trustee alleges that Mr. Cooper made this promise with the intention of not fulfilling it, and that such false promise was material and was made for the purpose of inducing the Trustee to agree to the sale of the Oakridge Property.  The Trustee alleges that she relied on Mr. Cooper's false promise and accordingly, filed the Motion to Sell.  As a result of Mr. Cooper's false promise, the Trustee alleges that the bankruptcy estate has suffered injury.  Thus, the Trustee alleges that Mr. Cooper is liable for fraud pursuant to Texas Business and Commerce Code § 27.01.  The Trustee seeks damages for Mr. Cooper's fraud under the Texas Business and Commerce Code in an amount equal to the lesser of (i) the total amount of lien claims that remain outstanding against the estate as a result of Mr. Cooper's refusal to distribute the Oakridge Property proceeds pursuant to

---

[38] This is the total amount of proceeds received by the Debtor from the sale of the Oakridge Property.

the Sale Order; and (ii) $122,307.16.[39]  The Trustee also seeks

attorneys' fees, pre-judgment and post-judgment interest, court

costs, and other costs and expenses.

**B.    Defenses of Mr. Cooper**

Mr. Cooper has asserted the following affirmative defenses:

(1) "laches" because the Co-Plaintiffs have waited an

inordinately long time to seek relief against Mr. Cooper and

should be barred; (2) "limitations as to any non-bankruptcy

causes of action" (specifically fraud under state law), since the

alleged fraud appears to have accrued more than four (4) years

before the Adversary Proceeding was filed; (3) "estoppel" because

there are no remaining secured creditors (including Cadle) who

were entitled to assert a secured claim against the Exempt

Property, and Cadle is also estopped from asserting such claim by

virtue of the inaction of its predecessor; (4) "mutual mistake,"

because Mr. Cooper's failure to pay "liens or encumbrances" or

"liens and encumbrances" under the Sale Order was due to a mutual

mistake under the Sale Order; (5) "accord and satisfaction"

because the claims of the Trustee were fully satisfied with the

$50,000 payment; (6) "res judicata" since no existing creditor

holds a secured claim that could have been asserted against the

proceeds of the sale of the Exempt Property; (7) "waiver" because

---

[39] This is the total amount of proceeds received by the Debtor from the
sale of the Oakridge Property.

the Co-Plaintiffs are barred from bringing this action since they failed to act to recover the alleged sums owed for more than four (4) years; and (8) "discharge in bankruptcy" because Mr. Cooper received his discharge on August 6, 1999.  Mr. Cooper also asserted that he made improvements to the 480 Property in the approximate amount of $15,000 and that such improvements should be credited against any sum owing to the Trustee.

## IV. Conclusions of Law

**A.** **Should Mr. Cooper's Discharge be Revoked Under Section 727(d)(3) and/or Should Mr. Cooper be Required to Pay the Trustee Damages for Failure to Abide by the Sale Order?**

Section 727(d)(3) of the Bankruptcy Code provides that "on request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if . . . the debtor committed an act specified in subsection (a)(6)." Section 727(a)(6)(A), which is the subsection applicable in the Adversary Proceeding, provides that "[t]he court shall grant a discharge, unless the debtor has refused, in the case to obey any lawful order of the court, other than an order to respond to a material question or to testify."  While some courts have held that an action to revoke discharge brought under 727(d)(3) and 727(a)(6) should be treated as a civil contempt proceeding (*see, e.g., Hunter v. Magack (In re Magack)*, 247 B.R. 406, 409-10 (Bankr. N.D. Ohio 1999); *United States v. Richardson (In re*

-18-

*Richardson)*, 85 B.R. 1008, 1011 (Bankr. W.D. Mo. 1988)), the majority of courts, including the Fifth Circuit, have found that the word "refused" requires the showing of a willful or intentional act, not merely the showing of a mistake or inability to comply. *See Friendly Finance Discount Corp. v. Jones (In re Jones)*, 490 F.2d 452, 456 (5th Cir. 1974); *See also Smith v. Jordan (In re Jordan)*, 521 F.3d 430, 433-35 (4th Cir. 2008) (agreeing with the majority of courts that the word "refused" requires the showing of a willful or intentional act). Thus, in order for the Co-Plaintiffs to prevail on their section 727(d)(3) claim, the Co-Plaintiffs must prove that the Debtor willfully and intentionally failed to follow the terms of the Sale Order, by not using the proceeds from the sale of the Oakridge Property to pay off all of the liens on the Oakridge Property, including Cadle's lien. Similarly, regarding the Trustee's other claims under common-law fraud and the Texas Business and Commerce Code, the Trustee would need to prove that Mr. Cooper willfully and intentionally disobeyed the terms of the Sale Order, in order to rise to the level of fraud under either common-law fraud or section 27.01 of the Texas Business and Commerce Code.

Taking into account the evidence presented at the Trial, the court finds that there has been no showing that the Debtor willfully or intentionally violated the terms of the Sale Order. The credible evidence was that no one—not the Debtor and not the

Trustee—was aware of the totality of liens asserted against the Oakridge Property.  The only three liens that were identified in the Sale Motion and that were identified in the closing statement prepared by the title company for the Sale of the Oakridge Property, were paid in full from the proceeds that Mr. Cooper was entitled to receive at the closing.  There was no evidence presented that Mr. Cooper had some secret knowledge of the Later Discovered Liens.  Moreover, it stretches the bounds of credulity to assume that Mr. Cooper and the Trustee would have agreed that clearly avoidable liens as to the Exempt Property (*i.e.*, the Later Discovered Liens, none of which were in the nature of a mortgage, home equity, taxes, or other permissible encumbrances against a Texas homestead) would be paid from the proceeds of the Exempt Property when there was no legal means for them to attach to such property.  Either neglectfulness was in play, and/or an outright mistaken belief existed at the time of the Sale Motion and the Sale Order that the three Known Liens were likely the only liens that were applicable with regard to the Oakridge Property.  The Trustee's own words at an earlier hearing in the Bankruptcy Case were telling.  At the Trial, the Trustee read into evidence (and agreed to on the record) certain statements that were made by Elmquist at the hearing to approve the Compromise.  Specifically, Elmquist stated that:

> [w]e do believe that Mr. Cooper clearly has an obligation
> to make restitution to the estate, but in doing so, we

feel that the estate has received all it's going to
receive, or should receive from those transactions, and
that [as to] the Oakridge transaction, [and the] sale of
the homestead, there was simply a mutual mistake of fact,
and thus, [there are] not grounds to revoke discharge
over failure to abide by the court order relating to that
transaction.[40]

This testimony, coupled with the fact that there was no other
evidence presented to show that the Debtor willfully or
intentionally violated the Sale Order, suggests that there was
(at the most) negligence and/or a mistake of fact underlying the
Sale Order. Accordingly, this court holds that the Co-Plaintiffs
have not met their burden to revoke the Debtor's discharge under
section 727(d)(3). Likewise, the Trustee has not proved the
required elements of common-law fraud or fraud under section
27.01 of the Texas Business and Commerce Code and, therefore, is
not entitled to any damages based upon the Debtor's purported
violation of the terms of the Sale Order.

**B.    Should the Debtor's Discharge be Revoked under Section 727(d)(2)?**

Section 727(d)(2) provides:

(d) on a request of the trustee, a creditor, or the
United States Trustee, and after notice and a hearing,
the court shall revoke a discharge granted under
subsection (a) of this section if . . . (2) the debtor
acquired property that is property of the estate, or
became entitled to acquire property that would be
property of the estate, and knowingly and fraudulently
failed to report the acquisition of or entitlement to
such property, or to deliver or surrender such property
to the trustee.

---

[40] *See* Transcript, pgs. 34-35.

-21-

The Co-Plaintiffs bear the burden to "establish that the Debtors acquired or became entitled to acquire property of the estate, *and* knowingly and fraudulently failed to report or deliver the property to the trustee." *See McNally v. Echart (In re Echart)*, 374 B.R. 596, 598 (Bankr. E.D. Tex. 2007) (*citing Holder v. Bennett (In re Bennett)*, 126 B.R. 869, 873 (Bankr. N.D. Tex. 1991)). Here, neither the Co-Plaintiffs nor the Debtor disputes that the Debtor acquired property of the estate, specifically, the proceeds from the sale of the 480 Property and the 470 Property. Thus, the only issue that the Co-Plaintiffs must prove is that the Debtor, by a preponderance of the evidence, knowingly and fraudulently failed to report, **or** knowingly and fraudulently failed to deliver, the proceeds from the sale of the 480 Property and the 470 Property. *See McNally,* 374 B.R. at 598-99 (emphasis added).

As noted by the bankruptcy court in *McNally*, "proving a knowing and fraudulent intent is not a simple matter, for rare will be the debtor who provides direct evidence of his fraudulent intent." *Id*. at 599. Accordingly, "fraudulent intent is most often found by relying on inferences drawn from a course of conduct." *Id.; See also First Tex. Svgs. Ass'n v. Reed (In re Reed)*, 700 F.2d 986, 991 (5th Cir. 1983) (finding that a debtor's whole pattern of conduct evidences his fraudulent intent).

Here, the Debtor's course of conduct showed that initially

-22-

Mr. Cooper was operating under a **mistaken** and, arguably, **stubborn** belief that he could either: (a) credit what he, in his mind, had overpaid the Trustee in connection with the Non-Exempt Oakridge Property against the proceeds he received and owed to the Trustee in connection with the sales of the 480 Property and the 470 Property; or (b) perhaps "re-trade" the deal with the Trustee (using the 480 Property and the 470 Property sale proceeds as leverage).[41]  The court would also note that Mr. Cooper's actions were not as bad as some defendants that this court sees in typical section 727 actions.  For example, Mr. Cooper never hid the 470 Property and the 480 Property (*i.e.,* he scheduled them in his Schedules from the very beginning).  Second, there is credible evidence that, early on at least (as of November 16, 2000), Mr. Cooper did, indeed, erroneously think that the $50,000 homestead transaction with the Trustee had resolved the bankruptcy estate's interest in the 470 Property and the 480 Property—a misunderstanding that Mr. Cooper's original bankruptcy attorney quickly corrected.[42]  Third, there is credible evidence that Mr. Cooper never hid the fact (at least when confronted) that there were sales of the 470 Property and the 480 Property. Finally, there is plenty of evidence to suggest that the Trustee was not very diligent in pursuing turnover of the proceeds at

---

[41] *See* Reed's Exhibit 11; Defendant's Exhibit RR.

[42] *See* Reed's Exhibits 11 and 19.

-23-

times (there often being long gaps of time where she was not communicating with Mr. Cooper regarding the turnover of the sale proceeds).  However, the question to this court is ultimately whether Mr. Cooper should be construed to have acted "knowingly and fraudulently."  For the following reasons, the court believes that Mr. Cooper did indeed act knowingly and fraudulently.

First, there is credible evidence that Mr. Cooper, without a doubt, acted "knowingly."  Shaff was clear in his testimony, which Mr. Cooper indicated he agreed with, that he informed Mr. Cooper in no uncertain words, and numerous times, that Mr. Cooper must turnover the proceeds from the sales of the 480 Property and 470 Property and that it was a very serious matter if he did not.[43]  Based on these communications, Mr. Cooper, in fact, knew a full year-and-a-half before the sale of the 470 Property that he was under an obligation to turnover the proceeds he received, if any, from its sale.

Moreover, this court must conclude that Mr. Cooper also acted "fraudulently."  The reality is that there was eventually more here, on the part of Mr. Cooper, than just a ***mistaken*** and ***stubborn*** belief that he could re-trade the deal with the Trustee. For, in reality, Mr. Cooper essentially ***concealed*** the fact that he had received the proceeds from the sales of both the 480 Property and the 470 Property for many months.  He only admitted

---

[43] *See* Transcript pgs. 71-74 and 98.

receipt of the proceeds once the Trustee **discovered and**
**confronted** Mr. Cooper about the fact that these properties had
been sold. Additionally, Mr. Cooper represented early on to the
Trustee that there was no intent to liquidate the properties,
despite the fact that this was certainly not true.[44]
Additionally, the court takes judicial notice of the Schedules in
this case, in which Mr. Cooper valued the 480 Property and the
470 Property at a mere $4,000 each, a much lower amount than what
Mr. Cooper ultimately received from the sale of the two
properties.[45]

The court finds that, at a minimum, Mr. Cooper acted with a
reckless indifference with regard to his duties pertaining to
these properties based upon the Debtor's conduct throughout the
entirety of the Bankruptcy Case. First and foremost, the Debtor
significantly undervalued the 480 Property and the 470 Property
in the Schedules. Next, the Debtor expressed a mistaken
impression that the Trustee had given up the bankruptcy estate's
rights in the 480 Property and the 470 Property early in the
Bankruptcy Case, where the Sale Motion and the Sale Order were
not at all ambiguous on this point. Next, the Debtor did not
initially disclose, and has never turned over the proceeds from

---

[44] *See* Trustee's Exhibit 11.

[45] There was no evidence presented at the Trial as to where this
valuation came from, but this valuation certainly proved not to be accurate.

-25-

the sale of the 480 Property.  Then, almost three-and-a-half years later, the Debtor, again, did not disclose nor turnover the proceeds from the sale of the 470 Property (when, by that point, it should have been extremely clear to him that the Trustee expected him to do so).  The existence of **multiple opportunities** for Mr. Cooper to know of and comply with his duties as a "debtor" under the Bankruptcy Code with regard to the 480 Property and the 470 Property leads this court to the inescapable conclusion that fraudulent intent must be inferred.  At some point during the relevant time frame at issue here, it became **more** than simply **mistaken beliefs and stubbornness** on the part of Mr. Cooper; rather, it became a situation of Mr. Cooper intentionally not disclosing, and then later, deliberately withholding property that he (whether he liked it or not and whether he thought it was fair or not) was required to deliver to the Trustee.

### V. Conclusion

A discharge in bankruptcy is a privilege, not a right.  To obtain (and retain) this privilege, a debtor must act with absolute candor and cooperation *vis-a-vis* the trustee.  Moreover, a debtor's exercise of dominion and control over an estate asset, to the detriment of the bankruptcy estate and creditors, cannot go unnoticed.  Based upon foregoing, the court finds in favor of the Co-Plaintiffs as to the 727(d)(2) count and holds that Mr.

-26-

Cooper must lose the privilege of the discharge that he was earlier awarded in the Bankruptcy Case.

Additionally, since the proceeds from the sale of the 480 Property and the 470 Property are property of the bankruptcy estate, this court finds that Mr. Cooper, pursuant to section 542(a) of the Bankruptcy Code, shall immediately turn these proceeds over to the Trustee in the amount of $46,116.31 (plus pre-judgment and post-judgment interest as allowed by law). All other relief in the Adversary Proceeding is denied. A judgment will be entered consistent with this opinion.

###END OF MEMORANDUM OPINION###